JOHN J. O'CONNOR and YAEKO C. O'CONNOR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
O'Connor v. Commissioner
Docket No. 199-81.
United States Tax Court
T.C. Memo 1986-444; 1986 Tax Ct. Memo LEXIS 174; 52 T.C.M. (CCH) 499; T.C.M. (RIA) 86444; September 15, 1986. Randolph R. Slaton, for the petitioners. Henry E. O'Neill, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent determined *177 the following deficiencies and additions to petitioners' Federal income taxes: Addition to Tax
Year
Deficiency
under Sec. 6653(b) [1]
1976
$3,544
$2,913
1977
5,368
3,950
1978
6,840
3,420
The issues for decision are (1) whether petitioners are entitled to certain deductions disallowed by respondent; (2) whether payments made to or on behalf of petitioners' children during the years 1976 through 1978 are deductible; and (3) whether part of the underpayment of tax for each year was due to fraud. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated by this reference. John J. O'Connor and Yaeko C. O'Connor (petitioners) resided in Honolulu, Hawaii, at the time they filed their petition in this case. During the years 1976 through 1978, John O'Connor (hereinafter petitioner) operated a publishing business as a sole proprietor, under the name Mitsuba Publishing Company, (hereinafter Mitsuba). Petitioners *178 have been in the publishing business for 25 years. They filed joint Federal income tax returns for the years 1976 through 1978. Respondent issued a timely statutory notice of deficiency on October 7, 1980. Petitioners' Federal income tax returns for the years 1976 through 1978 reflect the following information concerning the operation of their publishing business: 1976
1977
1978
Gross Receipts
$145,036
$220,555
$260,012
Deductions
120,861
191,900
225,284
Net Profit
24,175
28,655
34,728
During 1976 and 1977, petitioners had unreported income of $2,736.37 and $4,411.72, respectively, representing amounts which were deposited into the bank accounts for their publishing business. Petitioners concede that these amounts were not reported as income on their Federal income tax returns for the years in issue. Petitioners' Federal income tax returns for the 1976, 1977, and 1978 taxable years were prepared by H & R Block. For each of the years, petitioner organized the various checks involved, totaled the amounts on an adding machine, made a handwritten notation on the adding machine tape as to the category of the expense, and presented the categorized *179 totals to H & R Block. During the years 1977 through 1979, the years for which returns for 1976 through 1978 were prepared and filed, it was H & R Block's practice in the preparation of tax returns to accept the categorization placed on a group of checks by a taxpayer. During 1977 through 1979, H & R Block set its basic fee for the preparation of tax returns based upon the complexity of the return and the number of different forms required. If a particular taxpayer did not have his or her records organized, H & R Block would assist in the organization of the records. H & R Block charged in hourly rate for the time spent in organizing a taxpayer's records over and above the basic fee charged for the actual preparation of the return itself. On May 21, 1978, petitioner issued check number 1658 in the amount of $46.07 payable to Sears. This check represents payment for the repair of a television. Petitioners deducted this amount on their 1978 income tax return as an "office expense." During 1978, petitioner issued the following checks: Date
Check No.
Amount
Payee
03/25/78
1452
$300
Co-Gard Coating
07/12/78
1800
100
United California Bank
08/18/78
1919
624
Island Sprinkler
*180 Check number 1919 represents payment for the installation of a lawn sprinkler system at petitioners' residence; check number 1800 represents the initial deposit to open an account at United California Bank; and check number 1452 represents the purchase of roofing materials installed at petitioners' residence. Petitioners deducted the amounts of these checks on their 1978 income tax return as a "miscellaneous expense." Petitioner issued the following checks during 1978: Date
Check No.
Amount
Payee
07/15/78
1815
$140.60
Metropolitan Life
10/10/78
2074
45.00
State Farm Insurance
10/10/78
2078
335.90
State Farm Insurance
These checks represent the payment of premiums for personal life and automobile insurance. Petitioners deducted the amounts of these checks on their 1978 Federal income tax return as an "insurance expense." In addition, they paid personal medical insurance premiums of $1,386.30 to Kaiser. Petitioners deducted this amount both as an itemized deduction on Schedule A and as an "insurance expense" on Schedule C of their 1978 income tax return. Petitioner issued the following checks during 1978: Date
Check No.
Amount
Payee
1/13/78
1203
$580.29
Int. Rev. Service
2/11/78
1280
1,005.80
Int. Rev. Service
6/15/78
1741
95.68
H & R Block
6/19/78
1758
1,000.00
Cash
7/11/78
1784
2,635.00
Int. Rev. Service
*181 Additionally, on September 1, 1978, petitioner issued check number 1967 in the amount of $188.82 payable to the Internal Revenue Service. This check includes $126.55 for a delinquency addition to tax, $25.31 for a failure to pay addition to tax, and $36.96 in interest with respect to the O'Connors' 1977 income tax liabilities. The checks numbered 1203, 1280, and 1784 represent payments made on petitioners' joint income tax liabilities. Petitioners deducted the amounts of these checks on their 1978 income tax return with check number 1741 being deducted on both Schedules A and C. Respondent disallowed all but $37 (representing the interest component of check number 1967) of the claimed deductions. During the 1977 taxable year, petitioner issued the following checks: Date
Check No.
Amount
Payee
01/26/77
301
$2.00
Traffic Violations Bureau
02/26/77
359
37.00
Professional Underwriters Corp.
03/07/77
384
2.00
Traffic Violations Bureau
04/05/77
479
5.00
Traffic Violations Bureau
04/24/77
537
5.00
Traffic Violations Bureau
04/26/77
558
5.00
Traffic Violations Bureau
06/03/77
680
2.00
Traffic Bureau
06/28/77
720
2.00
Traffic Bureau
06/28/77
721
140.60
Metropolitan Life Ins.
07/15/77
793
2.00
Traffic Bureau
12/03/77
1020
5.00
Traffic Bureau
*182 The checks to the traffic bureau represent payment of parking tickets; the check to The Metropolitan Life Insurance Company represents payment of a life insurance premium; and the check to Professional underwriters Corporation is a travel agency bond. Petitioners deducted the amounts of these checks, plus an additional $500 for which they were unable to produce any underlying documentation, on their 1977 Federal income tax return as "miscellaneous" expenses. The total deduction (rounded to $708) was disallowed by respondent. During 1977, petitioner issued the following checks in connection with their 1976 Federal income tax liabilities. Date
Check No.
Amount
Payee
04/15/77
507
$1,223
Internal Revenue Service
07/11/77
778
1,059
Internal Revenue Service
In addition, they paid the Internal Revenue Service the following amounts on September 26, 1977, in connection with their 1976 income tax liabilities: $85.19
Estimated tax addition to tax
105.90
Delinquency addition to tax
10.59
Failure to pay addition to tax
Petitioners also paid the Internal Revenue Service $392.25 (exclusive of interest) in 1977 in connection with their *183 1973 income tax liabilities. Petitioners now concede that their claimed deduction in 1977 (rounded to $2,876), relating to their Federal income tax liabilities, is not allowable. [2]
On July 29, 1976, petitioner issued check number 273 payable to "cash" in the amount of $750. The proceeds of the check were used to purchase a savings bond at the Bank of Hawaii.A receipt from the Bank of Hawaii for $750 was found in the same monthly statement as the check in question. Petitioners deducted this amount on their 1976 Federal income tax return as a "miscellaneous expense." During 1977, petitioner issued the following checks payable to himself: Date
Check No.
Amount
05/06/77
578
$100
06/01/77
670
300
11/28/77
600
500
12/10/77
1040
100
Petitioners deducted these amounts on their 1977 Federal income tax return under the category of "office expense." They never provided respondent with any supporting documentation in connection with any of the checks payable to petitioner or to "cash." During 1978, petitioner *184 issued a check (number 1857) on July 31, in the amount of $1,448.21. Part of the proceeds from that check were used to purchase round-trip air fare for petitioner and his children between Honolulu, Hawaii and Portland, Oregon. [3] Petitioners deducted the entire amount represented by check number 1857 on their 1978 Federal income tax return. Petitioners have 5 children who were claimed as dependents during the years in issue. During 1976 through 1978, their children attended the following schools on a full-time basis. [4]
Name
1976
1977
1978
ROBERT
Univ. of Portland
Univ. of Portland
Univ. of Portland
MARIA
St. Francis H.S. &
Univ. of Portland
Univ. of Portland
Univ. of Portland
DAVID
St. Louis H.S.
St. Louis H.S. &
Univ. of Portland
Univ. of Portland
KATHLEEN
Sacred Heart Academy
Sacred Heart Academy
Sacred Heart Academy
& Chaminade Univ.
ROSE
Sacred Heart Academy
Sacred Heart Academy
Sacred Heart Academy
*185 Mitsuba had 12 different publications during each of the years in issue, including directories, newspapers, brochures and other publications. Mitsuba prepared all of these publications for printing, but the actual printing was done by an outside printer. Mitsuba accomplishes this by gathering the information, preparing specifications for type styles and sizes, typesetting the information, dividing the information into formats such as editorial content, advertising content, display advertising content and classified advertisement content. Following completion of the organizational process, the advertising and the editorial content are designed, and the material is waxed, cut to size, and positioned, a process known as "paste-up." The material is then organized so that it will be camera ready for the printer. During the years in issue, petitioners' children were capable of performing all of the various functions, with the exception of typesetting, involved in petitioners' publishing business. They performed delivery services, office and banking services, posting of advertising accounts, and the graphic art functions, including the paste-up process, the ordering of type, the designing *186 of the advertising and editorial content, and the selection of photographs. The paste-up and layout work performed in petitioners' publishing business required the use of drafting boards, T-squares, and compasses. During the years in issue, petitioner did at least some of the layout and paste-up work on the publications produced in the business. Petitioners' children had been involved in the business since they were in grammar school and some had worked for their father for as long as 10 years. The children were not paid while in grammar school, however, because they were not skilled in the business at that time. Petitioner maintained time cards for the hours allegedly worked by the children. The time cards were not prepared by him on a contemporaneous basis. The record in this case discloses a complete lack of correlation between dates and amounts of payments and the hours allegedly worked by the children. Although the children purportedly worked on a regular basis, they were often paid "on demand" and, in some cases, they were paid in advance for work that was to be performed sometime in the future. These advances sometimes would coincide with a need of some type on the *187 part of the child (e.g., tuition). There are notations on the bottom of the time cards purportedly reflecting the total wages paid to a particular child during the year. The figures shown on the time cards, however, do not correspond to the actual payments. Although the payments to the children were allegedly not keyed to school tuition costs, the only payments made to Kathleen and Rose in 1977 were tuition payments. Likewise, two of the three payments to Maria in 1976 (representing 92 percent of the total and the only payments reflected on Maria's delinquent 1976 income tax return) were for tuition. Additionally, at least two of the four payments to David in 1977 was for school tuition. The children allegedly earned different hourly wages (between $3 and $5) based on their age. However, the time cards for the 1978 taxable year, reflect that all the children earned $5 per hour despite a 6-year range in age among them. The $5 per hour wage actually represents a pay cut for Robert when compared with what he ostensibly earned in 1977. But, according to the time cards, Robert devoted more than twice as much time to his father's business in 1978 as did his sisters Kathleen *188 and Rose, who both ostensibly received raises while devoting substantially fewer hours in 1978 than in 1977. The children who resided in Hawaii would allegedly work several hours every day after school in addition to sometimes working all weekend. The time cards, however, indicate no after school or weekend hours worked by David in 1977 or by Rose and Kathleen in 1978. Kathleen and Rose were the only children attending school in Hawaii for the entire 1978 taxable year. In addition, the 1977 time card for Kathleen reflects that she never worked more than one hour on any given day in 1977. The 1978 time cards for both David and Maria reflect some non-summer entries, despite the fact that both were full-time students at the University of Portland during the 1978 academic year. [5] Additionally, Maria had an infant son to care for in addition to her studies in Portland. David admitted that all of the work that he performed in his father's business was done while in Hawaii. Petitioners' children were good students. After school, they had homework assignments which they *189 brought home and completed. In addition, the children participated in extracurricular activities sponsored by their schools. One of their daughters was on the speech team during the years in issue, and David O'Connor participated in both high school football and basketball. Football and basketball practices generally took place immediately after school and lasted approximately 2 and 1/2 hours. The children also had normal household chores in addition to their responsibilities with regard to their father's business. The time cards in evidence in this case for 1977 and 1978 also reflect other inconsistencies. For example, Maria O'Connor's 1977 time card indicates that she worked 8 hours on June 31, 1977, even though there are only 30 days in the month of June. Additionally, despite the entry showing 8 hours of work by Maria on July 1, 1977, Exhibit 118-DN indicates that Ms. O'Connor spent part of this same day flying between Tokyo, Japan, and Honolulu, Hawaii. In addition, according to Maria's 1977 time card, she worked 144 hours out of a total 320 hours while traveling with her parents throughout the Orient. Robert O'Connor returned to college in Portland, Oregon, on or before *190 August 23, 1977, as evidenced by the fact that he negotiated check number 889 for $1,700 in Portland on that same date. According to Robert's 1977 time card, however, he worked a full 8 hours on both August 23rd and August 24th of 1977. In addition, seven of the eight checks payable directly to Maria in 1977 were negotiated in Oregon and 70 percent of the total payments for the year were made (according to her 1977 time card) prior to her working a single hour. Maria received all of her 1978 payments prior to July 31, 1978, even though, as of this date, she had worked only 58 percent of the total hours shown on her time card. In addition, Robert received no payments after June 2, 1978, even though he had worked only 61 percent of his total hours by that date. On many occasions, petitioner wrote several checks to his children on the same day for the same amount. The February 8, 1977, payments to Robert and Maria were identical, even though the two children were ostensibly compensated at different rates during 1977 and had not yet rendered any services. Petitioners did not take any deductions for payments to anyone other than the children for the work allegedly done in the business. *191 Petitioners' returns for 1976 through 1978, however, reflect deductions for office, shop, paste-up, and delivery expenses substantially in excess of the amounts paid to or on behalf of the children. During the 1976, 1977, and 1978 taxable years, petitioners did not withhold Federal income tax, Social Security, or other taxes from any payments made to or on behalf of their children. Furthermore, as of the date of the petition filed in the instant case, petitioners had not filed any employment tax returns (Forms 940 and 941) reflecting their children as employees. Additionally, as of the date of the petition, none of the children had filed any Federal income tax returns for the years in issue. [6]
During 1976, petitioners deducted the following payments made to or on behalf of their children: Robert: Category
Date
Check No.
Amount
Deducted
01/01/76
1
$600
Paste-up
08/07/76
289
1,260
Office
11/18/76
175
500
Paste-up
*192 Petitioners deducted $5,600 attributable to the checks numbered 1 and 175 as paste-up expenses. They now concede that $4,500 of the claimed deduction is not allowable. The proceeds of check number 289 were used to pay tutition expenses at the University of Portland. Maria: Category
Date
Check No.
Amount
Deducted
07/20/76
267
$ 204.87
Travel
(partial)
08/07/76
288
1,260.00
Office
08/15/76
294
1,260.00
Office
TOTAL:
$2,724.87
The proceeds of the checks numbered 288 and 294 were used to pay tuition expenses at the University of Portland. On July 20, 1976, petitioner issued a check (number 267) payable to Triumph Travel in the amount of $614.61. Of this amount, $204.87 represents one-way air fare for Maria O'Connor to fly from Honolulu, Hawaii to Portland, Oregon on August 12, 1976. The balance represents round-trip air fare for petitioner to fly between Honolulu and Portland. Petitioners deducted the entire $614.61 on their 1976 Federal income tax return as a "travel expense." Respondent disallowed the portion of the check (rounded to $205) attributable to Maria O'Connor's air fare. During 1977, petitioners deducted *193 the following payments made to or on behalf of their children: [7]
Robert: Category
Date
Check No.
Amount
Deducted
02/08/77
322
$ 50.00
Paste-up
03/05/77
380
50.00
Paste-up
03/21/77
417
100.00
Paste-up
04/04/77
468
100.00
Paste-up
04/26/77
554
100.00
Paste-up
05/09/77
589
150.40
Paste-up
05/23/77
634
100.00
Paste-up
07/14/77
771
100.00
Paste-up
08/20/77
889
1,700.00
Office
09/08/77
949
248.28
Travel
(partial)
12/10/77
1041
100.00
Paste-up
TOTAL:
$2,798.68
The check numbered 589 represents life insurance premiums on policies covering Maria O'Connor. The proceeds of check number 889 were used to pay tuition and fees at the University of Portland. Maria: Category
Date
Check No.
Amount
Deducted
02/08/77
323
$ 50.00
Paste-up
02/21/77
363
200.00
Paste-up
03/09/77
398
148.00
Paste-up
03/16/77
410
100.00
Paste-up
03/30/77
449
20.00
Paste-up
04/11/77
493
100.00
Paste-up
09/08/77
949
124.28
Travel
(partial)
12/03/77
1016
50.00
Paste-up
12/10/77
1043
100.00
Office
TOTAL:
$892.28
On *194 September 8, 1977, petitioner issued check number 949 in the amount of $1,011.66 payable to Triumph Travel Corp. Included in this check was one-way air fare for Maria between Honolulu, Hawaii and Portland, Oregon. During 1977, Maria accompanied her parents on a trip to the Orient. David: Category
Date
Check No.
Amount
Deducted
01/29/77
302
$ 535.00
Shop
08/20/77
890
1,700.00
Office
09/08/77
949
124.28
Travel
(partial)
12/10/77
1042
100.00
Office
TOTAL:
$2,459.28
The proceeds of check number 302 were used to pay tuition for David at St. Louis High School. Petitioner issued check number 949 to Triumph Travel Corp. on September 8, 1977 in the amount of $1,011.66. Of this amount, $124.28 was used to pay for David's one-way air fare between Honolulu, Hawaii and Portland, Oregon. Check number 890 represents the payment of tuition and fees on David's behalf at the University of Portland. Kathleen: Category
Date
Check No.
Amount
Deducted
01/29/77
303
$310
Office
The proceeds of check number 303 were used to pay tuition at Sacred Heart Academy. Rose: Category
Date
Check No.
Amount
Deducted
01/29/77
304
$310
Office
12/10/77
1081
850
Office
*195 The proceeds of both of these checks (number 304 and 1081) were used to pay tuition at Sacred Heart Academy. During 1978, petitioners deducted the following payments made to or on behalf of his children: Robert: Category
Date
Check No.
Amount
Deducted
01/03/78
1132
$ 260.60
Travel
(partial)
01/09/78
1157
1,375.00
Shop
01/26/78
1223
50.00
Office
02/17/78
1300
100.00
Shop
02/22/78
1319
137.31
Travel
02/24/78
1331
100.00
Shop
03/03/78
1363
100.00
Office
03/10/78
1383
100.00
Office
03/18/78
1408
100.00
Paste-up
03/28/78
1460
100.00
Paste-up
04/01/78
1484
100.00
Paste-up
04/08/78
1500
100.00
Shop
04/20/78
1539
200.00
Delivery
04/20/78
1546
150.40
Insurance
04/26/78
1560
100.00
Delivery
05/25/78
1674
130.30
Travel
(partial)
06/02/78
1707
100.00
Office
TOTAL:
$3,303.61
A portion of the proceeds of check number 1132, issued by petitioner and payable to Triumph Travel, represents payment *196 of Robert's round-trip air fare between Honolulu, Hawaii and Portland, Oregon. Checks numbered 1319 and 1674, also issued by petitioner and payable to Triumph Travel, represent payment of Robert's one-way air fare between Honolulu, Hawaii and Portland, Oregon. Check number 1546 represents payment of premiums for personal life insurance to Metropolitan Life Insurance covering Robert O'Connor. Check number 1157 represents the payment of tuition and fees for Robert at the University of Portland. Maria: Category
Date
Check No.
Amount
Deducted
01/03/78
1132
$ 290.66
Travel
(partial)
01/11/78
1169
50.00
Office
01/12/78
1170
1,290.00
Office
01/24/78
1211
50.00
Office
02/18/78
1304
50.00
Office
03/03/78
1362
50.00
Shop
03/18/78
1411
148.00
Insurance
03/28/78
1451
50.00
Office
04/06/78
1494
50.00
Shop
04/14/78
1527
50.00
Shop
04/23/78
1551
100.00
Shop
05/06/78
1597
100.00
Paste-up
05/23/78
1661
100.00
Office
06/08/78
1720
100.00
Office
07/21/78
1828
100.00
Office
07/31/78
1857
283.63
Travel
(partial)
TOTAL:
$2,862.29
A portion of the proceeds of checks numbered 1132 and 1857, *197 issued by petitioner and payable to Triumph Travel, represents the payment of round-trip air fare for Maria and her infant son between Honolulu, Hawaii and Portland, Oregon. The proceeds of check number 1170 were used to pay tuition for Maria O'Connor at the University of Portland. Check number 1411 represents payment of premiums for personal life insurance to Mutual of New York covering Maria O'Connor. David: Category
Date
Check No.
Amount
Deducted
01/03/78
1132
$ 282.62
Travel
(partial)
01/09/78
1158
1,375.00
Shop
01/26/78
1224
50.00
Office
04/01/78
1474
50.00
Office
04/17/78
1532
50.00
Office
05/15/78
1628
100.00
Delivery
05/25/78
1674
130.30
Travel
(partial)
05/26/78
1677
200.00
Delivery
07/31/78
1857
298.66
Travel
(partial)
12/25/78
2287
100.00
Misc.
TOTAL:
$2,636.58
Check numbers 1132 and 1857 represent, in part, payment for David's round-trip air fare between Honolulu, Hawaii and Portland, Oregon, and check number 1674 represents payment of David's one-way air fare between the same two cities. Check number 1158 represents the payment of tuition and fees for David at the University *198 of Portland, and check number 2287 represents the payment of a Christmas "bonus" for David. Kathleen: Category
Date
Check No.
Amount
Deducted
07/31/78
1857
$283.63
Travel
(partial)
09/05/78
1979
49.80
Misc.
12/25/78
2289
100.00
Misc.
TOTAL:
$433.43
Check number 1857 represents, in part, payment for Kathleen's round-trip air fare between Honolulu, Hawaii and Portland, Oregon. Check number 1979 was used to purchase class books for Kathleen at Chaminade University and check number 2289 represents the payment of a Christmas "bonus." Rose: Category
Date
Check No.
Amount
Deducted
07/31/78
1857
$283.63
Travel
(partial)
12/25/78
2288
100.00
Misc.
TOTAL:
$383.63
A portion of the proceeds from check number 1857 were used to purchase round-trip air fare for Rose between Honolulu, Hawaii and Portland, Oregon, and check number 2288 represents the payment of a Christmas "bonus." OPINION Issue I -- Claimed Business Expenses Deductions
Section 162 allows a taxpayer deductions *199 for ordinary and necessary expenses paid or incurred during the taxable year in his trade or business. Deductions are, however, a matter of legislative grace. New Colonial Ice Co. v. Helvering,292 U.S. 435, 440 (1934). Petitioners must qualify under the specific rules and regulations imposed by Congress to be allowed business expense deductions. Deputy v. duPont,308 U.S. 488 (1940). Respondent's notice of deficiency is presumed correct, and petitioners have the burden of proving that it is erroneous. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a).[7]
A. 1977 Expenses
Petitioners offered no evidence concerning the circumstances surrounding a $500 deduction claimed in 1977 as a "miscellaneous expense" and $874.98 claimed as an "office expense" in 1977. Because petitioners have failed to provide evidence to document their assertion that such payments were ordinary and necessary business expenses paid or incurred in their publishing business, we sustain respondent's determination on this issue. Rule 142(a); *200 Welch v. Helvering,supra.Similarly, petitioners have offered no evidence to support the deductibility of a $37 payment made to Professional Underwriters Corporation as a travel agency bond. The checks made payable to the Traffic Bureau (Nos. 301, 384, 479, 537, 558, 680, 720, 793, and 1020) represent the payment of parking tickets. Respondent argues that these payments are nondeductible because of the application of section 162(f). Section 162(f) provides that no deduction "shall be allowed under subsection (a) for any fine or similar penalty paid to a government for the violation of any law." The deduction of fines and penalties uniformly has been held to frustrate state policy in a severe and direct manner by reducing the "sting" of the penalty prescribed by the state legislature. Tank Truck Rentals v. Commissioner,356 U.S. 30, 35, 36 (1958). It is clear that the governmental statutes or ordinances violated by petitioners were intended to ensure the orderly operation of motor vehicles on the highways. To allow the fines instituted to punish *201 violations of such statutes or ordinances to be offset or subsidized through an income tax deduction would be sharply at odds with public policy. Thus, we will sustain respondent's determination on this issue. [8]
The parties have stipulated that a $500 check to petitioner (No. 600) represents a personal draw from his business. Petitioner testified that this payment was made directly to himself and that it actually constitutes reimbursement for miscellaneous expenses that he incurred and for which he had retained receipts.We note, however, that no documentation was provided regarding these expenditures and we do not believe petitioner's claim that his receipts were lost by the Internal Revenue Service. Therefore, we sustain respondent's determination regarding this issue. B. 1978 Taxes Expense
Petitioners deducted a total of $5,505.59 consisting of the checks numbered 1203, 1280, 1741, 1758, 1784, and 1967 on their 1978 tax returns as a "tax expense." Respondent apparently concedes that they are entitled to deduct $36.96 *202 which represents interest paid by them on their 1977 income tax liability. We note that petitioners deducted a payment in the amount of $95.68 made to H & R Block (check number 1741) on both Schedule A and Schedule C of their 1978 tax return. Respondent concedes that this amount should properly be allowed, but solely as a Schedule A deduction. We agree with respondent. Petitioners are not permitted to also deduct this same item on Schedule C. Respondent asserts that the deduction claimed by petitioners with regard to their payment of Federal income tax should be disallowed by virtue of section 275. We agree. Section 275 provides that no deduction shall be allowed for the payment of Federal income taxes. Petitioners' failure to concede this adjustment is surprising in light of their concession of the same issue for 1977. Petitioners deducted, as part of their 1978 "taxes expense", the proceeds of check number 1758 in the amount of $1,000. Check number 1758, payable to "cash", was dated June 19, 1978 and had as a notation at the bottom the word "taxes." Petitioner testified that he *203 did not know what "taxes" were paid with the proceeds of check number 1758. He said he probably used the $1,000 to purchase a cashier's check which was in turn used to pay certain taxes. Petitioner's explanation that he may have used a cashier's check because of the large amount of money involved (i.e., "so the check isn't lost or something like that") is doubtful in view of the fact that he had used his regular checks to make other tax payments in even larger amounts. Furthermore, petitioner failed to provide us with any evidence to support the deductibility of the claimed $1,000 "taxes expense." Therefore, we sustain respondent's determination on this issue. C. 1978 Insurance Expense
In 1978, petitioners paid personal medical insurance premiums of $1,386.30. They deducted this amount both as an itemized deduction on Schedule A and as a business expense on Schedule C of their 1978 Federal income tax return. Respondent allowed the itemized Schedule A deduction, but obviously petitioners can only deduct this amount once. Petitioners deducted an additional $521.50 as an "insurance expense" in 1978. This amount consists of checks numbered 2074 and 2078 made payable *204 to State Farm Insurance and check number 1815 payable to the Metropolitan Life Insurance Company. Petitioners concede that these expenditures represent the payment of premiums for personal life and automobile insurance premiums.Such personal expenditures are rendered nondeductible by virtue of section 262, which provides as follows: SEC. 262.PERSONAL, LIVING, AND FAMILY EXPENSES. Except as otherwise expressly provided in this chapter, no deduction shall be allowed for personal, living, or family expenses. Accordingly, we sustain respondent's determination with respect to this issue. D. 1976 "Miscellaneous" and 1977 "Office" Expenses
On July 29, 1976, petitioner issued check number 273 payable to "cash" in the amount of $750. The proceeds of this check were used to purchase a savings bond at the Bank of Hawaii. A receipt from the bank for $750 was found in the same monthly statement as the check in question. Petitioners deducted this amount on their 1976 Federal income tax return as a "miscellaneous expense." Petitioner claims that although the proceeds of check number 273 *205 may in fact have been used to purchase a savings bond, the $750 is nonetheless deductible because the check actually represented reimbursement for expenses incurred by him in his publishing business. According to respondent, however, petitioners failed to produce any documentation in support of their reimbursement theory. We agree. Similarly, there was no documentation offered by petitioners with regard to payments of $300 and $100 made to John O'Connor in 1977 and deducted as an "office expense" (checks numbered 670 and 1040, respectively). We sustain respondent's determination as to these checks as well.Check number 578 in the amount of $100 was payable to cash and was deducted as an "office expense" on petitioners' 1977 return. As to this check, petitioners again failed to provide us with documentation to show that the proceeds were used to pay ordinary and necessary expenses for purposes of section 162. Furthermore, petitioner indicated in his testimony that this was probably a personal expenditure because the check did not have a notation on it. E. 1978 Office and Miscellaneous Expenses
On May 21, 1978, petitioner issued check number 1658 in the amount of $46.07. *206 Petitioners deducted this amount on their 1978 income tax return as an "office expense." The parties have stipulated that check number 1658 represents payment for the repair of a television. Respondent asserts that an expense incurred in repairing a television is inherently personal and therefore should be disallowed. We agree. See section 262. [9]
The proceeds of check number 1800 were used as the initial deposit to open a bank account at the United California Bank. Petitioners deducted this amount as a "miscellaneous expense" on their 1978 tax return. According to petitioner, the bank account was opened at United California Bank so that his business could commerce work on one of petitioners' publications. Although petitioners allege that check number 1800 was used to open a new bank account, they never claimed that any business expenditures were actually made with this $100.Therefore, we sustain respondent's determination on this issue. On March 25, 1978, petitioner issued a check (number 1452) in the amount of $300 payable to Co-Gard Coating. *207 This check was used for the purchase of roofing materials at petitioners' residence. In addition, on August 18, 1978, petitioner issued check number 1919 in the amount of $624 payable to Island Sprinkler. This check was used to pay for the installation of a lawn sprinkler at petitioners' home. Both of these amounts were deducted on petitioners' 1978 income tax return as a "miscellaneous expense." Petitioners allege that they purchased an $18,000 typesetting machine which was used in their business and which was kept in the garage. According to petitioners, the roofing materials were installed over the garage so as to waterproof the area of the residence where the typesetting machine was located. The sprinkler system was purchased and installed for dust-control purposes, again in connection with the typesetting machine. There is no documentary evidence supporting petitioners' purchase of the typesetting machine which they claim was acquired in 1978. Although petitioner stated that the machine was used in his business and that he advised his return preparer about the machine, petitioners' 1978 income tax return fails to reflect any depreciation or investment tax credit with *208 respect to the typesetting machine. Furthermore, the expenditures relating to the roofing and sprinkler system occurred at some point prior to the acquisition of the machine. We do not think that petitioners have sustained their burden of proving that their roofing and sprinkler expenditures were related to the alleged purchase of a typesetting machine. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Additionally, petitioners failed to establish that their expenditures for the roofing and the sprinkler system constitute ordinary and necessary expenses paid or incurred during the taxable year in carrying on their trade or business. Expenditures constituting improvements or betterments having a useful life extending beyond the taxable year in which the expenditures were made, must be capitalized and recovered through depreciation deductions. Section 263; Section 1.263(a)-1(b), Income Tax Regs. See Hotel Sulgrave, Inc. v. Commissioner,21 T.C. 619, 621 (1954). [10]
*209 Issue II -- Claimed Business Expense Deductions for Payments Made to or on Behalf of Petitioners' Children
We next consider the issue of whether certain payments made to or on behalf of petitioners' children during the years 1976 through 1978 constitute deductible business expenses. Section 162(a)(1) provides that a deduction shall be allowed for ordinary and necessary business expenses paid or incurred during the taxable year including reasonable salaries. Compensation is deductible under section 162(a)(1) only if it is (1) reasonable in amount, (2) based on services actually rendered, and (3) paid or incurred. See section 1.162-7(a), Income Tax Regs.
Respondent has disallowed these claimed compensation deductions maintaining that petitioners are attempting to claim deductions for the personal support of their children. Petitioners assert that the payments represent compensation paid to their children in the operation of their publishing business. Respondent does concede that petitioners would be entitled to a deduction for reasonable wages paid to *210 their children for personal service actually rendered as bona fide employees in the conduct of a petitioners' trade or business. See Rev. Rul. 72-23, 1972-1 C.B. 43. Whether amounts paid as compensation are reasonable and whether the amounts represent payments purely for services rendered are questions of fact to be resolved on the basis of all the surrounding facts and circumstances. Eller v. Commissioner,77 T.C. 934, 962 (1981); Levenson & Klein, Inc. v. Commissioner,67 T.C. 694, 711 (1977). The burden of proof as to these issues is on petitioners. Botany Worsted Mills v. United States,278 U.S. 282, 289-290 (1929); Rule 142(a). The fact that payments are made to petitioners' minor children does not preclude their deductibility. Denman v. Commissioner,48 T.C. 439, 448-451 (1967). During the 3 years in issue, petitioners deducted the following payments made to or on behalf of their children: [11]
1976
Amount
Robert
$2,360.00
Maria
2,724,87
1977
Robert
$2,798.68
Maria
892.28
David
2,459.28
Kathleen
310.00
Rose
1,160.00
$7,620.24
1978
Robert
$3,303.61
Maria
2,862.29
David
2,636.58
Kathleen
433.43
Rose
383.63
$9,619.54
*211 Petitioner testified that he considered the children to be his employees and that they were paid an hourly wage. He also testified that he maintained contemporaneous time records reflecting the number of hours worked by each child, and the rate of compensation paid. However, the record here discloses a complete lack of correlation between the dates and amounts of payments and the hours allegedly worked by the children. Petitioner often paid the children large sums in advance for work that had not yet been performed. Although petitioner testified that the payments were not based on school tuition expenses, the only payments made to Kathleen and Rose in 1977 were for tuition payments, and 92 percent of the total and the only payments reflected on Maria's delinquent 1976 income tax return were for tuition. In addition, two of the four payments made to David *212 in 1977 (representing 91 percent of the total) were for school tuition. Petitioner testified that the notations made at the bottom of the time cards reflected the total wages paid to that particular child during that year. However, the figures shown on the cards do not correspond to the actual payments. Furthermore, an entirely different set of figures is found on the delinquent returns filed by the O'Connor children. Petitioner also testified that the children earned different hourly wages based on their age. But, the time cards for 1978 reflect that all of petitioners' children were compensated at the rate of $5 per hour despite a 6-year range in age among them. [12]
Petitioner testified that the children who resided in Hawaii worked several hours each day after finishing school and sometimes worked all weekend. The time cards, *213 however, show no after-school or weekend hours worked by David in 1977 or by Rose and Kathleen in 1978. Kathleen and Rose were the only children attending school in Hawaii for the entire 1978 taxable year. The 1977 time card for Kathleen indicates that she did not work more than a single hour on any given day in 1977. Petitioner's claim that his children worked several hours each day following school lacks credibility in light of the time demands imposed on the children by homework assignments and normal household chores. One of his daughters was on a speech team during the years in issue, and David participated in both football and basketball while he was in high school. Football and basketball practices generally took place immediately after school and lasted approximately 2 and one-half hours. Although it may have been theoretically possible for the children to perform certain tasks in their father's business while they were traveling or on the mainland at college, all of the time-consuming lay-out, paste-up, and production work was performed at petitioners' residence in Hawaii. Furthermore, there was no evidence presented by petitioners that any work was actually performed *214 outside Hawaii. Thus, all of the entries on the time cards reflecting hours worked on dates when the children were traveling or in Portland at college are suspect. For example, Maria's 1977 time card reflects that she worked 8 hours on July 1, 1977, even though she spent a portion of that same day flying between Tokyo, Japan, and Honolulu, Hawaii. In addition, according to Maria's time card, out of a total of 320 hours ostensibly worked by her in 1977, 144 hours were worked during the period that she was traveling with her parents in the Orient. Petitioner testified that all of the payments to Maria in 1977 were for "paste-up" work which is clearly not the type of work which could be performed while traveling. David's 1977 time card reflects that he worked half days on Saturdays during the same period that he was attending college on a full-time basis in Oregon and working at the University of Portland. David testified, however, that whatever work he did for his father was performed while at home in Hawaii. The non-summer entries on Maria's time cards are also suspicious because she too was a full-time student in Oregon during all of 1977 and 1978. Maria also had an infant *215 son to care for in addition to her studies at the university. Robert's 1977 time card contains similar discrepancies. He returned to college in Portland, Oregon, no later than August 23, 1977, as evidenced by the fact that he negotiated check number 889 for $1,700 in Portland on August 23, 1977. Yet his 1977 time card shows that he worked 8 hours on both August 23 and 24. Additionally, Robert's 1978 time card reflects that he worked 8 hours on April 26 and 27, even though he spent at least a portion of April 26 flying from Honolulu to Portland. Virtually all the checks payable directly to Maria in 1977 were negotiated in Oregon and, according to her 1977 time card, 70 percent of the total payments she received in that year were made prior to her working a single hour. Similarly, in 1978, Maria received all of her payments prior to July 31, 1978, even though she had worked only 58 percent of the total hours shown on her timecard as of that date. In addition, Robert received no payments after June 2, 1978, even though he had only worked 61 percent of his total hours as of that time. As previously stated, compensation is deductible under section 162(a)(1) only if it is based *216 on services actually rendered. Here there is serious doubt as to whether the payments made to or on behalf of the children reflected actual services performed by them. The payments made to them certainly do not correspond with the actual services performed, and on many occasions petitioner wrote several checks to his children on the same day for identical amounts. For example, the February 8, 1977 payments made to Robert and Maria were exactly the same, despite the fact that Robert and Maria were ostensibly compensated at different rates during 1977 and had not yet rendered any services. Three checks were prepared by petitioner on December 25, 1978, in the amount of $100 each payable to David, Kathleen, and Rose. Although these checks appear to be Christmas gifts, petitioners sought to deduct these checks as "miscellaneous" expenses. Petitioner testified that these three checks were intended to represent bonuses for work performed during the preceding year. Such assertion, however, is unlikley in light of the fact that, according to their 1978 time cards, Kathleen and Rose had not performed any services for the last 4 months of that year. While petitioners claim that they *217 considered their children to be employees, the objective evidence clearly indicates otherwise. Petitioners failed to withhold income taxes from the alleged wages paid to the children as required by section 3402(a). [13] They also failed to withhold Social Security taxes from the payments in question. Petitioner testified that he believed that he was exempt from having to withhold Social Security because his children were full-time students. Presumably, he was referring to section 3121(b)(3)(A) which excludes from the definition of "wages" for social security tax purposes payments for "service performed by a child under the age of 21 in the employ of his father or mother." Section 3121(b)(3)(A). We note that petitioners failed to withhold social security taxes from the payments to Robert in 1977 and 1978 and Maria in 1978 even after their 21st birthdays. These factors have been previously cited by this Court as grounds for negating a claim that payments made to a taxpayer's minor children constituted payments for bona fide business employment. See Hill v. Commissioner,T.C. Memo. 1982-143, *218 and Furmanski v. Commissioner,T.C. Memo. 1974-47. It is also clear that the O'Connor children did not regard the payments they received from their father as compensation. They failed to file Federal income tax returns for the years in issue as required by section 6012(a)(1) until after the petition was filed in the instant case. Robert, who received the largest share of these payments, still had not filed a tax return as of the time this case came to trial. [14] David acknowledged in his testimony that his 1978 tax return did not reflect the payments he received from his parents. David also testified that his delinquent filing of his 1978 return was in no way prompted by his parents' pending case before this Court. *219 We think this unlikely since David prepared and submitted to the Internal Revenue Service a sworn, notarized affidavit dated July 1, 1981, which dealt specifically with the employment compensation issue in dispute in this case. It is clear from the record that there are glaring contradictions regarding the nature of the employment agreement, if any, between petitioner and his children, and the nature of the services performed. It is indeed difficult to believe that virtually all of the production work for a business grossing $145,036, $220,555, and $260,012 during the years in issue was performed during after-school and weekend hours by the children residing in Hawaii and during summer vacations by the children attending college in Oregon. The only rational conclusion that we can draw is that petitioner must have handled a much larger share of the production work than he now admits. Moreover, there is no evidence in the record to indicate that Mrs. O'Connor did not assist *220 her husband in the family business. Petitioners have not presented this Court with any credible evidence upon which we can determine the precise nature of the services rendered by the children, the number of hours of labor involved, or the reasonable value of the work performed. [15] We do believe, however, that the children performed some services in connection with petitioners' publishing business. Therefore, exercising our best judgment and bearing heavily against petitioners whose inexactitude is of their own making, we find the reasonable value of the services performed by the children to be equal to 20 percent of the amounts claimed by petitioners on their Federal income tax returns for the years in issue. Thus, we will allow a deduction under section 162 only to that extent. Cohan v. Commissioner,39 F.2d 540, 543-44 (2d Cir. 1930). Issue III -- Sectioin 6653(b) Additions to Tax for Fraud
*221 The final issue is whether petitioners are liable for the addition to tax under section 6653(b) for fraud. [16] Whether a taxpayer acted fraudulently is determined on the basis of all the facts and circumstances. Stratton v. Commissioner,54 T.C. 255, 284 (1970). Respondent bears the burden of proving, by clear and convincing evidence, that part of the underpayment of tax in each year was due to fraud. Section 7454(a); Rule 142(b). This burden is satisfied if it is shown that the taxpayer "intended to evade taxes known to be owning by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes." Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983); Stoltzfus v. United States,398 F.2d 1002 (3d Cir. 1968). The existence of fraud is a question of fact to be gleaned from a consideration of the entire record. Gajewski v. Commissioner,67 T.C. 181 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud will never be presumed. Beaver v. Commissioner,55 T.C. 85, 92 (1970). *222 The fraudulent intent, however, may be proved by circumstantial evidence emanating from the taxpayer's entire course of conduct. Rowlee v. Commissioner,supra at 1123; Stone v. Commissioner,56 T.C. 213, 223-224 (1971). The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner,supra at 223-224. Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969). *223 We believe that the facts in this case clearly and convincingly establish that petitioners had the intent to evade tax necessary to sustain respondent's burden of proof with respect to the section 6653(b) addition to tax for fraud. During the taxable years involved in this case, petitioner was a highly resourceful person who was successful in his business affairs. Petitioners' income tax returns indicate that his business had gross receipts of $145,036, $220,555, and $260,012 for the taxable years 1976 through 1978, respectively. We are convinced that petitioner overstated his business deductions with a willful intent to defeat and evade tax. "It is a fair inference that petitioner, possessing the business acumen he undoubtedly possessed, could hardly have inadvertently overstated his business expense deductions to the extent that he did." Neaderland v. Commissioner,52 T.C. 532, 540 (1969). Petitioners overstated their various business expenses by improperly deducting many purely personal expenditures. Petitioners, for example, sought to deduct the $750 purchase of a savings bond or bonds as a "miscellaneous expense." Additionally, in 1977, petitioners claimed *224 Schedule C deductions for the payment of parking tickets and, in 1978, they sought to deduct the cost of repairing a television and the payment of personal automobile insurance premiums. Petitioners also deducted the amount of a check (number 1800), which was used to open up a new bank account at United California Bank. We found all of these expenditures to be purely personal in nature. [17]
Finally, as already discussed, petitioners deducted numerous personal support payments made to and on behalf of their children including expenditures for tuition, school supplies, and travel to and from school. While we acknowledge that the children did perform some work in their father's business, thus entitling petitioners to *225 a small fractional share of the compensation deductions claimed, we nevertheless believe that such deductions were grossly and intentionally overstated in an attempt to subsidize nondeductible personal support expenditures. In addition to the personal expenditures that petitioners sought to deduct during the 3 years in issue, they also attempted to take numerous erroneous deductions. Any of these deductions standing alone could be explained as being merely a result of negligence or inadvertence. In the instant case, however, a regular pattern of such erroneous deductions can be discerned -- a pattern which we think is indicative of fraud. In January and November of 1976, petitioner issued two checks payable to Robert in the amount of $600 and $500, respectively. Petitioners deducted $5,600 attributable to these two checks as a "paste-up expense" on their 1976 Federal income tax return. Petitioners improperly deducted checks totaling $2,876 and $5,469 with regard to payments of their personal Federal income tax liabilities in 1977 and 1978, respectively. They have conceded that their 1977 deduction was in error. Part of the 1978 deduction consists of a check (number 1758) *226 made payable to cash in the amount of $1,000. Petitioner testified that he probably used the proceeds of check number 1758 to purchase a cashiner's check because he did not like to use personal checks for such large sums. We find his explanation hard to believe because he used personal checks to make payments to the Government on other occasions in even larger amounts. Petitioners' 1978 income tax return reflects two separate items where the same amounts were deducted twice on different schedules of their return. These consisted of a $95.68 payment to H & R Block, and $1,386.30 of personal medical insurance premiums. Both these amounts were taken as an itemized deduction on Schedule A and as a business expense on Schedule C. Petitioners were unable to offer any explanation for their numerous oversights other than their allegation that the errors were made by their return preparer without their awareness or consent. Petitioner's explanation that the entire pattern of erroneous deductions was the fault of their return preparer is entirely belied by the evidence in the record. Petitioner testified that it was his practice to merely present all of his unorganized and uncategorized *227 checks in a grocery bag. According to him, petitioners' return preparer organized, categorized, and judged the deductibility of each expenditure based solely on the notation appearing on the check. Mr. Leslie Nishimura, the revenue agent conducting the Internal Revenue Service's investigation, testified that the various checks he examined were organized, complete with an adding machine tape showing their various totals and a notation setting forth the category under which the expenditure was to be deducted. According to Mr. Nishimura, the notation appeared to be in petitioner's own handwriting. He testified that he was able to recognize petitioner's handwriting because of the many invoices and checks that he had reviewed during the audit. Petitioner was unable to offer any explanation for the numerous instances where a particular check was deducted under a category that was entirely different than its notation, or where the check bore no notation whatsoever, as shown below. Exhibit
Amount
Notation
Category Deducted
8-H
$1,260.00
Maria O'Connor
Office
9-I
600.00
Art charges
Paste-up
31-AE
100.00
None
Office
44-AR
148.00
Maria O'Connor
Paste-up
51-AY
150.40
Robert O'Connor
Paste-up
54-BB
50.00
Art work
Paste-up
55-BC
100.00
Art charges
Paste-up
59-BG
50.00
Art work
Office
60-BH
1,290.00
Art charges
Office
61-BI
50.00
None
Office
62-BJ
50.00
None
Office
63-BK
50.00
None
Office
64-BL
50.00
Art work
Office
65-BM
100.00
Paste-up
Office
66-BN
100.00
Paste-up
Office
67-BO
50.00
Art charges
Office
68-BP
50.00
None
Office
70-BR
46.07
Television repair
Office
71-BS
100.00
None
Office
82-CD
100.00
Open Account
Miscellaneous
85-CG
100.00
None
Miscellaneous
86-CH
100.00
Christmas
Miscellaneous
87-CI
100.00
Christmas
Miscellaneous
104-CZ
100.00
Paste-up
Shop
105-DA
50.00
Paste-up
Shop
106-DB
50.00
Paste-up
Shop
107-DC
100.00
Paste-up
Shop
108-DD
50.00
Paste-up
Shop
109-DE
100.00
Paste-up
Shop
*228 We think that if petitioners' return preparer (H & R Block) had performed the type of extensive organization and categorization functions that petitioners claim, the cost for performing these duties would certainly have been reflected as deductions on petitioners' returns. Mrs. Jean Adams, a district manager for H & R Block, testified that their charges for tax return preparation were based on the complexity of the return, the amount of work involved in the return preparation, and the number of different forms and schedules involved. A flat hourly charge, in addition to the charge for the preparation of the return, was made for any time spent by H & R Block in organizing a taxpayer's return. According to Ms. Adams, H & R Block would generally accept the categorization that a taxpayer placed on a group of checks. The Schedule C deductions claimed on petitioners' 1976 and 1977 income tax returns totaled $120,861 and $191,900, respectively. Petitioners also claimed numerous itemized deductions during the same years. Based upon the dates of the checks in the record reflected on the Schedule C expenses alone, the number of checks involved would have exceeded 300 for 1976 and 780 *229 for 1977. Although the 1976 return included Schedules A, B, C, D, SE, and Forms 2210 and 4798, the deduction under section 212(3) reflected on petitioners' 1977 return for 1976 return preparation was a mere $58, which amount included H & R Block's charge for preparing the state's 4 percent gross excise tax return. The 1977 return added two Forms 5329 to those listed above, and the total charge by H & R Block was only $95.68. Presumably these H & R Block charges also included the preparation of state income tax returns. We do not believe that such nominal charges are in any way reflective of the enormous time and effort that petitioners claim were expended by H & R Block in the preparation of their tax returns for the years in issue. We also note that all of the errors on petitioners' income tax returns imputed to H & R Block were consistently in their favor. It is clear from this record that petitioners deducted many personal expenditures as business expenses, knowing full well that such deductions would result in a substantial understatement of their income for the taxable years 1976, 1977, and 1978. As this Court stated in Hicks Co., Inc. v. Commissioner,56 T.C. 982, 1019, *230 (1971), affd. 470 F.2d 87 (1st Cir. 1972): The imposition of the addition to tax for fraud is based upon a state of mind, which is seldom susceptible of direct proof, but must be gleaned from all the facts and circumstances in the entire record. * * * It is clear that for purposes of fraud an understatement of taxes can be accomplished by an overstatement of deductions. [Citations omitted.] In view of all the facts in the instant case, we conclude that part of petitioners' underpayment of taxes for 1976, 1977, and 1978 was due to fraud.We do not believe that they acted innocently or in good faith or that their substantial overstatements of business expenses were the result of honest mistakes. Neaderland v. Commissioner,52 T.C. 532, 541 (1969). Accordingly, we hold that respondent has met his burden of proving fraud. [18]
*231 To reflect the concessions made by the parties and our conclusions with respect to the disputed issues, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue.↩
2. Petitioners also concede that their 1976 income tax return overstated allowable advertising sales agency fee deductions by $430.↩
3. Petitioners apparently concede that the portion of the proceeds of check number 1857 used to purchase Mr. O'Connor's air fare represents a non-deductible personal expenditure.↩
4. The University of Portland is a private university located in Portland, Oregon; Chaminade University is a private university located in Honolulu, Hawaii; St. Francis High School, St. Louis High School and Sacred Heart Academy are all private schools located in Honolulu, Hawaii. All of these schools charge tuition.↩
5. We note that David O'Connor was at home in Hawaii with a broken ankle from February 1978 to April 1978.↩
6. The 1976 returns for Robert and Maria, the 1977 returns for Maria, David, Kathleen and Rose, and the 1978 tax returns for Maria and David were all prepared on or about December 14, 1982, and were filed subsequent thereto.↩
7. We note that the total deduction claimed on petitioners' 1977 income tax return in the category of "office expense" includes $874.98 represented by missing exhibits 30-AD and 38-AL.↩
7. Unless otherwise indicated, all rule references are to the Tax Court Rules of Practice and Procedure.↩
8. We also note that petitioners presented no evidence regarding the connection, if any, between the traffic fines and their publishing business.↩
9. We find petitioner's explanation that the television repaired was used in his business to be both implausible and unsupported.↩
10. Sec. 263(a) provides in part as follows: SEC. 263. CAPITAL EXPENDITURES. (a) General Rule. -- No deduction shall be allowed for -- (1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate. * * * Section 1.263(a)-1(b) of the Income Tax Regs., provides in part as follows: (b) In general, the amounts referred to in paragraph (a) of this section include amounts paid or incurred (1) to add to the value, or substantially prolong the useful life, of property owned by the taxpayer, such as plant or equipment, or (2) to adapt property to a new or different use. Amounts paid or incurred for incidental repairs and maintenance of property are not capital expenditures within the meaning of subparagraphs (1) and (2) of this paragraph. * * *↩
11. It should be noted that petitioners also deducted payments to Metropolitan Life Insurance Companyof $140.60 (check no. 721 and 1815) in 1977 and 1978 as "Miscellaneous" and "Insurance" expenses. We understand from petitioner's testimony that these payments represent life insurance premiums on petitioners' children.↩
12. We note that the $5 per hour represents a pay cut for son Robert over what he ostensibly earned in 1977, despite the fact that, according to the time cards, he devoted over twice as much time to his father's business in 1978. On the other hand, Kathleen and Rose received raises in 1978 while devoting substantially less time than in 1977.↩
13. Sec. 3402(a) provides in part as follows: SEC. 3402. INCOME TAX COLLECTED AT SOURCE. (a) In General. -- Except as otherwise provided in this section, every employer making payment of wages shall deduct and withhold upon such wages a tax determined in accordance with tables or computational procedures prescribed by the Secretary. * * *↩
14. We note that only Kathleen in 1977 and Kathleen and Rose in 1978 were exempt from the filing requirement due to the fact that the amount of "wages" they received during those years did not exceed $750.↩
15. We note that there were no time cards provided for the 1976 taxable year. In addition, the time cards for 1977 and 1978 quite clearly had not been completed contemporaneously and, as shown above, were riddled with contradictions and inconsistencies.↩
16. Sec. 6653(b) provides as follows: SEC. 6653. FAILURE TO PAY TAX. * * * (b) Fraud. -- If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a). In the case of a joint return under section 6013↩, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse.
17. We note also that during 1976 and 1977, petitioners had unreported income of $2,736.37 and $4,411.72, respectively, representing amounts which were deposited into the bank accounts for their publishing business. Petitioners now concede that these amounts were not reported as income on their income tax returns for those 2 years. Petitioners also concede that their 1976 income tax returns overstated allowable advertising sales agency fee deductions by $430.↩
18. Petitioners requested an award of costs and attorney's fees pursuant to sec. 7430. Sec. 7430, however, is not applicable because the instant case was commenced prior to that section's effective date. Prior to the enactment of sec. 7430, this Court was without authority to award attorney's fees or costs. See McQuiston v. Commissioner, affd. without published opinion 711 F.2d 1064 (9th Cir. 1983); Sharon v. Commissioner, affd. per curiam 591 F.2d 1273 (9th Cir. 1978). Although unrelated to the fraud issue, petitioners contend in their opening brief that respondent's own records reflect that there are no deficiencies due from petitioners for the years in issue, citing a Certificate of Assessments and Payments (Ex. 130-DZ) and a computer-generated letter from the Fresno Service Center (Ex. 119). According to respondent, petitioners simply misread the documents. We agree. A Certificate of Assessments and Payments is merely a record of assessments made against a taxpayer as well as the payments made towards those assessments. Petitioners apparently fail to appreciate that the term "assessment" is a term of art with special legal implications. According to respondent, the reason that the deficiencies determined in the statutory notice are not reflected as assessments in exhibit 130-DZ is that sec. 6213(a) prohibits the Internal Revenue Service from making an assessment where "a petition has been filed with the Tax Court, until the decision of the Tax Court has become final." Exhibit 130-DZ reflects payments made by petitioners towards assessments made with regard to the tax liabilities reflected on the original returns, certain additions to tax and interest. Contrary to petitioners' contention, exhibit 119 does not represent a concession by respondent that no deficiency exists for the 1976 taxable year. The Certificate of Assessments and Payments merely reflects that petitioners, for reasons known only to themselves, made a payment to the Internal Revenue Service on October 22, 1981 (more than 10 months after filing their petition) for the year 1976 in the amount of $194.67. Because there was no unpaid assessed liability at that time against which to apply the payment, it remained as a credit to petitioners' account until February 14, 1983. On that date, that amount, plus $14.30 in interest earned on the credit, was applied against an assessed↩ liability with regard to petitioners' 1981 tax return. Exhibit 119 merely advises petitioners of that application of funds. It does not represent a concession of the instant case with respect to the 1976 taxable year.